UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

GEORGE ISAAC HERNANDEZ, JR.,

     Plaintiff,

v.

CHARLES SIMMONS, *et al.*,

     Defendants.

Case No. 3:15-cv-00954

Judge Aleta A. Trauger
Magistrate Judge Newbern

---

**<u>MEMORANDUM</u>**

On May 29, 2015, Plaintiff George Isaac Hernandez was housed in a one-man cell in Unit 7 of the DeBerry Special Needs Facility (DeBerry) in Nashville, Tennessee. During the first shift that day, at around 8:00 a.m., Sergeant Melissa McKissick came to Hernandez's cell and ordered him to be handcuffed so that he could be taken to shower. Hernandez refused and told McKissick that it was not his assigned time to shower, that he wanted to go back to sleep, and that he would shower during the second shift. McKissick asked again, Hernandez refused again, and this sequence repeated until McKissick called the cell extraction team (CERT Team) and asked for its assistance in removing Hernandez from his cell.

The CERT Team responded and, as McKissick had done, ordered Hernandez to "cuff up" so that he could be taken for a shower. Hernandez told the CERT Team that it was not his time to shower, that he wanted to go back to sleep, and that he would shower during the second shift. When Hernandez refused many more orders to be handcuffed, the CERT Team sprayed pepper spray into Hernandez's cell. After using the pepper spray, the CERT Team members again repeatedly ordered Hernandez to cuff up. Hernandez refused. Finally, in the face of Hernandez's

continued resistance, the CERT Team shot four pepper balls into Hernandez's cell.[1] Hernandez then allowed himself to be handcuffed and escorted to the shower.

In this action, Hernandez challenges the defendants' use of force against him. The defendants claim that the use of force was appropriate because Hernandez refused to comply with their orders, Hernandez's refusal to shower interfered with the health and safety of other inmates, and institutional discipline and control would be compromised if they allowed Hernandez to ignore their orders without consequence. Hernandez responds that the defendants had no need to use force against him because it was not his mandatory shower day, and no other inmate who refused to shower on May 29, 2015 was forced to do so. Hernandez also claims that inmates in his unit routinely did not shower for long periods of time and frequently refused to shower without being disciplined and, finally, that he was unfairly targeted because of his Hispanic ethnicity.

Now pending is the defendants' motion for summary judgment, to which Hernandez filed a response in opposition. (Doc. Nos. 149, 153.) The defendants filed a reply (Doc. No. 154), and Hernandez made several additional filings (Doc. Nos. 155, 156, 157). For the following reasons, the defendants' motion for summary judgment will be granted.

## I.      Procedural Background

Hernandez filed this action on September 3, 2015, alleging violations of his civil rights under 42 U.S.C. § 1983 against Deputy Warden Charles Simmons, who supervised the CERT Team; CERT Team members Lieutenant Davis, Lieutenant Wendell Howard, Corporal Jeremy

---

[1]      "Pepper balls are 'rifle-fired projectiles that break into pieces upon impact and release oleoresin capsicum powder (commonly known as mace), thereby causing both pain at the point of impact and irritation of the targeted individual's eyes and breathing passages.'" *Buck v. City of Albuquerque*, 549 F.3d 1269, 1289 (10th Cir. 2008) (quoting *Fogarty v. Gallegos*, 523 F.3d 1147, 1152 n.4 (10th Cir. 2008)).

Cantrell, Officer B. Morris, Officer C. Branson, and Officer Edward Spence; and Sergeant Melissa McKissick, who supervised Hernandez's DeBerry housing unit. (Doc. No. 1.) Hernandez claims that the defendants violated his Fourth and Eighth Amendment rights and his right to due process by using chemical agents to forcibly remove him from his cell. Hernandez also claims that the defendants took this action because he is Hispanic, violating his equal protection rights. (*Id.*) Hernandez seeks declaratory and injunctive relief and monetary damages.[2] (*Id.*)

After screening the action under the Prison Litigation Reform Act (PLRA) and granting Hernandez's motion for *in forma pauperis* status, the court ordered service on all defendants. Hernandez effected service on Defendants Spence, Howard, McKissick, Branson, and Simmons (Doc. Nos. 49, 50, 51, 52, 53), who filed a single answer (Doc. No. 42). Officers Morris, Cantrell, and Davis were never served and are not parties to this action. (Doc. Nos. 55, 56, 57.)

On May 16, 2017, after the close of discovery, the defendants timely filed a motion for summary judgment and statement of undisputed material facts. (Doc. Nos. 117, 118.) Because of ongoing discovery disputes and Hernandez's refusal to attend his deposition, the court reopened discovery and allowed the defendants until August 2, 2017, to file an amended motion for summary judgment. The court ordered Hernandez to file any response within twenty-eight days after service

---

[2]     Hernandez seeks declaratory relief prohibiting the defendants from using force against inmates who refuse to shower "unless they do the same to all other inmates . . . who refuse to shower" and requiring the defendants to follow "established [TDOC] policies relating to use of force, and forced showers." Because Hernandez was transferred to another facility, and because the relief he requests is specific to defendants who are not employed where Hernandez is now housed, his request for declaratory relief is moot. *Compare Colvin v. Caruso*, 605 F.3d 282, 295 (6th Cir. 2010) (finding injunctive relief claim not mooted by transfer when challenged kosher meal policy also applied to plaintiff at new prison), *with Proctor v. Applegate*, 661 F. Supp. 2d 743, 763 (E.D. Mich. 2009) (finding injunctive relief claim moot where none of the alleged acts that took place and none of the defendants were employed at a facility where any plaintiff was then housed). Hernandez also seeks an injunction prohibiting the defendants from transferring him "because of the filing of this complaint." Because Hernandez has been transferred since he filed his complaint, this claim is also moot. (Doc. No. 5, 38, 137, 160.)

of the defendants' motion. (Doc. No. 127.) On July 19 and 20, 2017, the defendants took Hernandez's deposition. (Doc. Nos. 150-6, 150-7.) Hernandez did not waive formal reading and signing of the deposition, and the defendants moved for additional time to obtain transcripts and allow for Hernandez to review them. The court extended the deadline to file an amended motion for summary judgment to October 23, 2017 and again directed Hernandez to file a response within twenty-eight days of receiving the defendants' amended motion. (Doc. No. 140.)

Hernandez did not review and sign his deposition in a timely manner, and the court again extended the time for the defendants to file an amended motion for summary judgment until November 22, 2017. (Doc. No. 146.) The defendants timely filed their amended motion for summary judgment and amended statement of undisputed material facts on November 22, 2017. (Doc. Nos. 149, 150.) Hernandez filed a "sworn affidavit and amended opposition to the defendants' amended motion for summary judgment" and a response to the amended statement of undisputed material facts on December 18, 2017.[3] (Doc. Nos. 152, 153.)

## II.    Statement of Facts[4]

At the time of the events relevant to this action, Hernandez was housed in a single-man cell in Unit 7F, a segregated housing unit at the DeBerry Special Needs Facility. It is undisputed that, at around 8:00 a.m. on Friday, May 29, 2015, during the first shift, McKissick ordered Hernandez

---

[3]    Hernandez's response is deemed filed when handed to prison authorities for mailing to the federal court. *Lyons-Bey v. Pennell*, 93 F. App'x 732, 733 (6th Cir. 2004); *Vandiver v. Corr. Med. Servs., Inc.*, No. 05-CV-72835-DT, 2006 WL 2516902, at *1 (E.D. Mich. Aug. 29, 2006). Hernandez certifies that he delivered his response for mailing on December 18, 2017. (Doc. No. 153, Page ID# 2184.)

[4]    The court draws these facts from the defendants' amended statement of undisputed material facts and supporting evidence, Hernandez's response to the amended statement of undisputed facts and supporting evidence, Hernandez's declaration, and the verified complaint. *El Bey v. Roop*, 530 F.3d 407, 414 (6th Cir. 2008) (holding that a verified complaint carries the same evidentiary weight as an affidavit for purposes of summary judgment).

to take a shower. (Doc. No. 1, PageID# 5; Doc. No. 150, PageID# 1507; Doc. No. 150-1, Page ID# 1513; Doc. No. 153, PageID# 2179–80.) The parties dispute whether prison policy required Hernandez to take a shower at that time and on that day.

The defendants claim that DeBerry post orders mandated that segregated inmates shower on Mondays and Fridays. (Doc. No. 150-1, PageID# 1514; Doc. No. 150-2, PageID# 1518; Doc. No. 150-3, PageID# 1552.) In support of this claim, the defendants submit copies of DeBerry post orders from 2014 and 2015 regarding inmate showers, which state that inmates shall shower at least every three days and that showers are mandatory on Monday and Friday. (Doc. Nos. 150-2, 150-3.) Hernandez argues that these post orders did not apply to him. (Doc. No. 153, PageID# 2178–80.) He notes that the 2014 post order states that it covers "Unit 7A – Supportive Living IV," which is not the unit where he was housed. (Doc. No. 150-2; Doc. No. 153, Page ID# 2179–80.) Hernandez also notes that the 2015 post order was not approved until July 1, 2015, more than a month after the May 29, 2015 incident at issue. (Doc. No. 150-3; Doc. No. 153, Page ID# 2179–80.) Moreover, Hernandez argues that inmates in his unit were split into a "high side" and a "low side," and that, on May 29, 2015, the high side where he was housed was not scheduled to shower until the second shift. (Doc. No. 150-7, PageID# 2096.) Hernandez states that this is why, when McKissick woke him and ordered him to shower, he told her that he wanted to keep sleeping and would shower later. (*Id.* at PageID# 2096–97, 2121, 2123–24; Doc. No. 1, PageID# 5.) He also testified that every other inmate on the high side showered during the second shift. (Doc. No. 150-7, PageID# 2096.)  The defendants do not offer any evidence to refute that point.

The parties also dispute why McKissick ordered Hernandez to shower. Hernandez states that McKissick singled him out because he is Hispanic. (Doc. No. 150-6, PageID# 1821; Doc. No. 150-7, PageID# 2098.) Hernandez states that he was the only Hispanic inmate housed in Unit 7F

and was the only inmate McKissick forced to shower on that day. (Doc. No. 1, PageID# 6; Doc. No. 150-7, Page ID# 2098–2100, 2123.) He states that McKissick knew that he was Hispanic because she had asked him his ethnicity "the first time [he] ran into her many years ago." (Doc. No. 150-7, PageID# 2106.) Hernandez finds evidence of discrimination in the fact that there were non-Hispanic inmates in his unit who had not showered for a longer period of time than Hernandez (Doc. No. 150-7, PageID# 2099, 2104, 2113), and who also refused to shower during the first shift, but were not punished (Doc. No. 153, PageID# 2197, 2199, 2200). Hernandez admits that McKissick did not make any statements suggesting that she was aware of or acting because of Hernandez's ethnicity. (*Id.* at PageID# 2099.) However, Hernandez states that he "felt like . . . [McKissick] was picking on me, . . . it wasn't my turn to shower and I told her no, I want to go to sleep and I'll shower on second shift." (*Id.* at PageID# 2123.) Hernandez testified that, "if [being dirty] is not an option, . . . then those inmates should have been taking showers too," and that, "if [McKissick] would have treated me like every other inmate on the high side and not discriminated against me particularly, then, that day, I would have taken a shower at the scheduled time." (*Id.* at PageID# 2097, 2113–14.)

McKissick states that she ordered Hernandez to shower because the post order established that it was his mandatory shower day and because he was "exuding a very unpleasant body odor due to his poor hygiene." (Doc. No. 150-1, PageID# 1514.) Nearly a month after the incident, McKissick explained to her captain by e-mail that Hernandez was given:

> a force[d] shower . . . due to his constant refusal to shower and his very poor hygiene as well as very bad body odor. This inmate is housed in Unit 7F where Mondays and Fridays are mandatory shower [days] . . . [A]t the time of the force[d] shower it had been several days since his last shower and he was smelling very badly. . . . [T]his is an ongoing issue with this inmate and it has been addressed several times before so he left us without an option because being nasty and dirty is not acceptable in building 7 and we do what we can to maintain a clean building as well as clean inmates.

(Doc. No. 153, PageID# 2202.)

Hernandez admits that, in the past, he has refused to shower and been disciplined for it. In 2014, while housed at DeBerry, Hernandez was issued "a disciplinary for refusing a direct order" to shower. (Doc. No. 150-7, PageID# 2066.) He also states that he has been accused of having poor hygiene on several occasions and that McKissick has previously accused him of smelling bad. (Doc. No. 150-6, PageID# 1940–41; Doc. No. 153, ¶¶ 8, 9; Doc. No. 155, PageID# 2234.) However, Hernandez disputes McKissick's claim that he had poor hygiene on May 29, 2015, stating that he had showered four days before the incident, on May 25. (Doc. No. 150-7, PageID# 2100–01.) Hernandez also states that he "washes himself with Dial anti-bacterial soap and a wet washcloth from his sink on Tuesdays, Thursdays, Saturdays and Sundays, the days the inmates are not given showers, and . . . uses Degree Antiperspirant." (Doc. No. 152, PageID# 2169.)

Shower logs submitted by the defendants establish that Hernandez showered on May 25, 2015.[5] (Doc. No. 118-5, PageID# 1255.) Before his shower on May 25, 2015, Hernandez had not showered for about two weeks. (Doc. No. 118-5, PageID# 1232–57.) The shower logs establish that, from May 10 to May 25, 2015, Hernandez showered only one time and refused to shower three times without consequences. (Doc. No. 118-5, PageID# 1253–55.)

The shower logs also establish that other prisoners in Unit 7F routinely go for long periods of time without showering and frequently refuse to shower without receiving punishment.[6] (Doc.

---

[5]     Although attached as an exhibit to Defendants' original motion for summary judgment (Doc. No. 118-5), Hernandez's shower logs were not attached to their amended motion for summary judgment.

[6]     The shower logs contain the notations "N" and "R". The court assumes that the "N" notation is used when the correctional officers note that a prisoner did not shower and the "R" notation is used when they direct a prisoner to shower, but the prisoner refuses.

No. 150-5.) Hernandez points to several examples, and the record contains more. (Doc. No. 153, PageID# 2190–2200; Doc. No. 150-5.) For example, Hernandez notes that Inmate Morganstern did not shower between May 10 and 22, 2015, refusing to shower three times during this period, and also did not shower from May 23 to May 30, 2015, refusing to shower twice. (Doc. No. 153, PageID# 2190–92.) Additionally, like Hernandez, Morganstern refused to shower during the first shift on May 29, 2015. However, unlike Hernandez, Morganstern was not forced to do so. (Doc No. 150–5, PageID# 1726–1733; Doc. No. 152, PageID# 2170; Doc. No. 153, PageID# 2180, 2190–92.) The shower logs also show that Inmate Ratliff did not shower between May 24 and June 5, 2015, and refused to shower four times during that period, including during the first shift on May 29, 2015, without punishment. (Doc No. 150-5, PageID# 1738–45; Doc. No. 153, PageID# 2180, 2194–95.) Other inmates also refused to shower during the first shift on May 29, 2015, apparently without consequence. (Doc. No. 153, PageID# 2197–2200.)

Nonetheless, there is no dispute that McKissick ordered Hernandez to leave his cell to take a shower during the first shift on May 29, 2015, "[m]aybe three, four times, at least." (Doc. No. 150–7, PageID# 2122; Doc. No. 150–1, PageID# 1514.) Nor is there any dispute that Hernandez refused to be handcuffed and taken for a shower. (Doc. No. 1, PageID# 5; Doc. No. 150–1, PageID# 1514; Doc. No. 150–7, PageID# 2096.) When Hernandez would not comply with her repeated orders to take a shower, McKissick radioed for the CERT Team to come to Hernandez's cell. (Doc. No. 150-7, PageID# 2097–98, 2122–23; Doc. No. 153, Page ID# 2202.)

The CERT Team gave Hernandez "multiple verbal warnings . . . that he would be removed from his cell if he refused to comply" with the order to cuff up to be taken to shower. (Doc. No. 150, PageID# 1507; Doc. No. 155, Page ID# 2234.) After Hernandez refused to "voluntarily leave the cell,despite several verbal warnings, short bursts of pepper spray were sprayed into his cell [by

a CERT Team member]. The spray was not effective." (Doc. No. 150, PageID# 1508; Doc. No. 155, PageID# 2234.)

After Hernandez ignored many additional orders to cuff up, a CERT Team member fired four pepper balls into Hernandez's cell. (Doc. No. 150, PageID# 1508.) Hernandez testified that he was sitting to the right of his cell, on his bed with his back against the wall, and that the first and fourth pepper balls hit his body. (Doc. No. 150-7, PageID# 2126–27.) Hernandez then agreed to cuff up. (Doc. No. 150, PageID# 1508.) He was taken to shower, then for medical observation. (*Id.*)

Hernandez states that the chemical agents the CERT team used:

caused [his] contact lenses to melt to his pupils and he had to physically rip his contacts off of his pupils causing [his] eyes to tear and bleed, damaging [his] vision and causing him headaches and migraines, which he still endures, and [he] endured immense pain and permanent eye damage and [his] vision has gotten worse and has changed 3 different times since he had to rip his contact lenses off of his pupils, and the chemical agents caused [his] skin to burn and the painful sensation lasted for several days, and the pain was so bad that [he] could not sleep for several days.

(Doc. No. 152, PageID# 2172.) He states that he suffered bruising and swelling but does not remember if there are medical records to document these injuries. (*Id.* at PageID# 2128.) Neither party offers medical records to document Hernandez's time in observation or his claimed injuries.

The CERT Team videoed its interaction with Hernandez, and the defendants have filed a copy of the video in support of their motion.[7] The court finds that the video reflects the following facts: When the CERT Team arrived at Hernandez's cell door, members of the CERT Team

---

[7]    A court may consider video evidence at summary judgment. *Scott v. Harris*, 550 U.S. 372, 380–81 (2007) (holding that, based on video evidence, a police officer did not use excessive force in ramming a fleeing suspect's car); *see also Griffin v. Hardrick*, 604 F.3d 949, 954 (6th Cir. 2010) (considering video evidence in ruling on defendant's motion for summary judgment of prisoner's excessive force claim).

ordered Hernandez to cuff up more than a dozen times over the course of the twenty-minute interaction. (Video.) When Hernandez failed to comply, a CERT Team member sprayed pepper spray into his cell through the door flap.[8] (*Id.* at 1:46.) Hernandez was again ordered to cuff up and again did not comply. (*Id.* at 2:40.) More pepper spray was sprayed into his cell. (*Id.* at 2:57.)

After the second round of pepper spray, the CERT Team members did nothing for more than ten minutes other than occasionally ask Hernandez to cuff up through the window of his cell door. (*Id.* at 2:58–16:38.) Hernandez eventually appears at the window of his cell with a blanket covering his nose and mouth and speaks to the CERT Team members. What he says is not intelligible from the recording; however, his demeanor is not aggressive. (*Id.* at 16:39.) Hernandez is then ordered to cuff up by the CERT Team many times in rapid succession. (*Id.* at 16:40–17:50.) Shortly thereafter, a CERT Team member speaks directly to the camera and states that a pepper ball gun will be deployed and pepper balls will be shot at the walls and the ceiling of Hernandez's cell. (*Id.* at 18:00.) A CERT Team member then deploys the pepper ball gun, firing four times, twice straight ahead and twice to the left. (*Id.* at 18:01–18:10.) The video does not show where the pepper balls land. (*Id.*) Within a few seconds after the last pepper ball is fired, Hernandez appears at his cell door with his hands behind his back to cuff up. (*Id.* at 18:30.) He does not appear to be in distress. Hernandez is handcuffed and his cell door is opened. When his cell door is opened, his bare upper body can be seen for several seconds. There are no visible marks. A CERT Team member takes Hernandez by the arm and removes him from his cell. (*Id.* at 18:54.) The recording ends with Hernandez in the shower having his handcuffs removed. (*Id.* at 19:37.)

After he showered, Hernandez was taken for medical observation. (Doc. No. 150, PageID# 1508–09; Doc. No. 155, PageID# 2234.) Hernandez was not returned to his cell where the chemical

---

[8]    All time references are approximate.

agents had been used, but was placed in a different cell. (Doc. No. 150-7, PageID# 2129.) Officers searched Hernandez's cell and discovered contraband pieces of wire and metal. (Doc. No. 150-4, PageID# 1560; Doc. No. 150-7, PageID# 2110.) Hernandez pleaded guilty to a Class C violation for the contraband and was punished with five days in segregation. (Doc. No. 150-4, PageID# 1558, 1563; Doc. No. 150-7, PageID# 2110–11.) McKissick states that "[o]fficers suspected . . . Hernandez was reluctant to leave his cell because he was hiding illegal contraband" (Doc. No. 150, PageID# 1509). Hernandez disputes this contention (Doc. No. 150-7, PageID# 2126) and accurately notes that none of the incident reports filed immediately after the CERT Team extraction mentioned any suspicion that Hernandez was hiding contraband or that contraband had been discovered (Doc. No. 153, PageID# 2203–10).

A TDOC "Use of Force Supplemental Report" and an incident report created after the extraction by Officer Howard states that:

> [O]n May 29, 2015 at approximately 0805 [Howard] was notified by . . . McKissick that inmate . . . Hernandez . . . was refusing to shower [although] [p]er Unit Post Orders Mondays and Fridays . . . are mandatory shower days on Unit 7 F-Pod. Inmate Hernandez was given an opportunity to comply to which he refused. At this time, I gave the order for the CERT team to respond. At approximately 0815 hours the mid-level door flap was opened by CERT Officer Charles Branson at which time CERT Officers Brad Morris and Edward Spence delivered two second bursts of Top Cop spray onto inmate Hernandez. The mid-level door flap was then secured. The Top Cop spray was ineffective in gaining compliance of Inmate Hernandez. The pepper ball custom carbine rifle was then used to deliver four 10x pepperballs onto the walls of cell 7F-124 by CERT Officer Branson. At this time inmate Hernandez complied and was taken to the shower for decontamination without further incident.

(Doc. No. 153, PageID# 2205–06, 2210.) Spence and two other CERT Team members also filed incident reports that give substantially the same account. (*Id.* at 2207–09.)

Hernandez submitted a grievance regarding the events of May 29, 2015, in which he identified McKissick, Howard, Spence, "C/O Branch (CERT),"and other DeBerry personnel who

are not parties to this action. (Doc. No. 153, PageID# 2218-19.) In his grievance, Hernandez complained that he was forced to take a shower in violation of TDOC policy, arguing that "the only way I can be forced to take a shower is if the Health Director and Warden signed the necessary paperwork and this was not done." (Doc. No. 153, PageID# 2220.) Hernandez also complained that he was "sprayed with mace and shot with pepper balls from a paint gun [which] is clearly excessive force and cruel and unusual punishment [because] I was not a threat to myself or others and I was in my cell trying to sleep." (*Id.*)  Importantly, Hernandez did not allege in the grievance that he suffered any injuries.

## III.   Legal Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To prevail, the moving party must prove the absence of a genuine issue of material fact as to any essential element of the opposing party's claim. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Stiles ex rel. D.S. v. Grainger Cty.*, 819 F.3d 834, 847 (6th Cir. 2016). In determining whether the moving party has met its burden, a court must view the factual evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Stiles*, 819 F.3d at 848. A court must not weigh the evidence and determine the truth of the matters asserted but instead must "determine whether there is a genuine issue for trial." *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 775 (6th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986)).

The absence of a triable material fact is shown if, "after adequate time for discovery," the nonmoving party "fails to make a showing sufficient to establish the existence of an element

essential to that party's case, and on which the party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; s*ee also Nolen v. FedEx TechConnect, Inc.,* 971 F. Supp. 2d 694, 711 (W.D. Tenn. 2013) (explaining that a moving party may succeed "by submitting affirmative evidence negating an essential element of the nonmoving party's claim, or by attacking the nonmoving party's evidence to show why it does not support a judgment for the nonmoving party") (citing 10A Charles A. Wright, *et al.*, Fed. Prac. & Proc. Civ. § 2727 (2d ed. 1998)). The moving party "ha[s] the initial burden of 'showing'— that is, pointing out to the district court — that there is an absence of evidence to support [the nonmoving party's] case." *Peterson v. Johnson,* 714 F.3d 905, 910 (6th Cir. 2013) (quoting *Celotex*, 477 U.S. at 325). If the moving party does so, the burden shifts to the nonmoving party "to 'designate specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Celotex*, 477 U.S. at 324).

To meet its burden, the nonmoving party must go beyond the pleadings and present specific facts demonstrating the existence of a genuine issue for trial. *Shreve v. Franklin Cty.*, 743 F.3d 126, 132 (6th Cir. 2014). "A mere scintilla of evidence by the nonmoving party is insufficient to defeat summary judgment; 'there must be evidence on which the jury could reasonably find for the [nonmoving party].'" *St. Clair Marine Salvage, Inc. v. Bulgarelli*, 796 F.3d 569, 574 n.2 (6th Cir. 2015) (alteration in original) (quoting *Anderson,* 477 U.S. at 252). If the evidence offered by the nonmoving party is "merely colorable," "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment may be granted. *Anderson,* 477 U.S. at 249–52. If the nonmoving party fails to make that showing, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial," *Celotex*, 477 U.S. at 323 and the moving party would be entitled to summary judgment.

This court's Local Rule 56.01 requires that any motion for summary judgment be accompanied by a separate statement of the material facts to which the moving party asserts there is no genuine issue for trial. M.D. Tenn. R. 56.01(b) (statement of undisputed material facts). Any party opposing the motion must respond to each fact by agreeing that the fact is undisputed or by demonstrating that it is in dispute by specific citation of evidence in the record. M.D. Tenn. R. 56.01(c) (response to statement of facts). Failure to respond under the terms of this rule shall indicate that the asserted fact is not disputed for purposes of summary judgment. M.D. Tenn. R. 56.01(f) (failure to respond).

## IV.    Analysis

To prevail on his § 1983 claims, Hernandez must show, first, that he was "deprived of a right secured by the Constitution or laws of the United States" and, second, that "the deprivation was caused by a person acting under color of state law." *Webb v. United States*, 789 F.3d 647, 659 (6th Cir. 2015). Hernandez alleges violations of the Eighth Amendment because he was subjected to cruel and unusual punishment; his right to due process because the defendants failed to follow TDOC policy regarding the use of force; his equal protection rights because McKissick targeted him because he is Hispanic and singled him out among all other inmates; and for violation of the Fourth Amendment, although the nature of that claim is not clear. The defendants argue that there are no disputed issues of material fact as to any of Hernandez's claims and that they are entitled to judgment as a matter of law. They also argue that the court should not consider Hernandez's response to their motion because it was untimely filed and that Hernandez's action must be dismissed as to defendants Simmons and Branson because he failed to exhaust his administrative remedies against those defendants, as required by the PLRA.

## A. Timeliness of Hernandez's Response

After several extensions of the deadlines set by the original scheduling order in this case, the defendants filed their amended motion for summary judgment on November 22, 2017. (Doc. No. 149.) Hernandez filed a response in opposition, which he certifies that he delivered for mailing twenty-six days later, on December 18, 2017. (Doc. No. 153, Page ID# 2184.) The defendants argue this response was untimely and should not be considered. They reason that the court's final order granting them a third extension of time in which to file their motion did not provide Hernandez with a specific number of days in which to respond and, therefore, that the default provision of a twenty-one-day response period contained in the court's Local Rule 56.01 must apply. (Doc. No. 154, PageID# 2221–22.)

As Hernandez correctly notes, the court's two prior orders addressing the summary judgment briefing schedule directed him to respond within twenty-eight days of the defendants' motions.[9] (Doc. Nos. 127, 140.) It was therefore quite reasonable for Hernandez to assume that he again had twenty-eight days in which to file his opposition. The court accepts Hernandez's response as timely filed.

## B. Failure to Exhaust Administrative Remedies Against Defendants Simmons and Branson

The defendants next argue that Hernandez has failed to exhaust his administrative remedies against defendants Simmons and Branson because he did not identify them in his internal prison grievance regarding this incident. (Doc. No. 151, PageID# 2159–60.) Hernandez concedes that the grievance he filed did not identify Simmons; he argues that he did identify Branson, but mistakenly named him as "Branch." (Doc. No. 150-7, PageID# 2084, 2086–87, 2088.). There is no dispute

---

[9]     The first scheduling order issued in this action on June 30, 2016 (Doc. No. 44) allowed Hernandez thirty days to respond to "all dispositive motions to dismiss or for summary judgment." (*Id.* at PageID# 158.)

that Hernandez named McKissick, Howard, and Spence in the grievance and that Hernandez pursued appeals through all three levels of the grievance process. (*Id.* at PageID# 2084–85.)

Exhaustion of administrative remedies "is mandatory under the PLRA and . . . unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007) (citing *Porter v. Nussle*, 534 U.S. 516, 524 (2002)); *see also* 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter*, 534 U.S. at 532. The purposes of exhaustion include "allowing a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record." *Jones*, 549 U.S. at 219. Failure to exhaust is an affirmative defense under the PLRA and defendants have "the burden to plead and prove [it] by a preponderance of the evidence." *Lee v. Willey*, 789 F.3d 673, 677 (6th Cir. 2015). "[T]o properly exhaust administrative remedies prisoners must 'complete the administrative review process in accordance with the applicable procedural rules'—rules that are defined not by the PLRA, but by the prison grievance process itself." *Jones*, 549 U.S. at 218 (quoting *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)).

Hernandez's failure to name Simmons and correctly identify Branson in his administrative grievance does not defeat his claims against them in this court. Nothing in the PLRA imposes "a 'name all defendants' requirement" on prisoners to properly exhaust their administrative remedies. *Jones*, 549 U.S. at 217. In fact, the Supreme Court in *Jones* specifically rejected the Sixth Circuit's court-imposed requirement that prisoners identify specific defendants in their

grievances, holding that any such requirement could only be established by the prison's own regulations. 549 U.S. at 217.

The defendants cite nothing in TDOC's administrative procedures establishing such a requirement here. Further, even if a name-all-defendants requirement were in place, it apparently was not the reason that prison officials denied Hernandez's grievance internally. This court will not enforce a requirement that a prison chooses to waive in its own administrative process. *See Reed-Bey v. Pramstaller*, 603 F.3d 322, 323, 326 (6th Cir. 2010) (declining to enforce a requirement that an inmate identify the "names of all those involved" in a grievance, where the Department of Corrections failed to enforce its own procedural rule). Hernandez has properly exhausted his claims against all defendants.

### C. Eighth Amendment: Excessive Force

The defendants argue that they are entitled to summary judgment on Hernandez's Eighth Amendment excessive force claim for two reasons. First, they argue that there is no question that their use of force was a good-faith effort to maintain discipline. Second, they argue that Hernandez cannot show that he suffered more than a *de minimis* injury as the result of any force used. (Doc. No. 151.) The defendants also argue that Hernandez offers no evidence that Simmons, Howard, or McKissick participated in the cell extraction where force was used and, therefore, cannot be found liable on this claim.

Hernandez responds that there was no reason to order him to shower that day—no policy required him to shower, several other inmates in his unit had not showered for a longer time than he had, and other inmates were not punished for refusing to shower during the first shift. Therefore, Hernandez argues, any force used to make him shower was excessive. Hernandez also argues that,

because he was locked in a one-man cell, he posed no disciplinary threat to himself or others that would have required forceful intervention. (Doc. No. 152, PageID# 2165.)

Under the Eighth Amendment's protections, punishment of those convicted of a crime may not be barbarous, nor may it contravene society's evolving standards of decency. *Rhodes v. Chapman*, 452 U.S. 337, 345–46 (1981); *Trop v. Dulles*, 356 U.S. 86, 101 (1958). The Eighth Amendment also prohibits conditions of confinement which, "although not physically barbarous, involve the unnecessary and wanton infliction of pain. Among unnecessary and wanton inflictions of pain are those that are totally without penological justification." *Rhodes*, 452 U.S. at 346 (internal citations omitted).

An Eighth Amendment excessive force claim has an objective component and a subjective component. *Santiago v. Ringle*, 734 F.3d 585, 590 (6th Cir. 2013) (citing *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2011)). "The subjective component focuses on the state of mind of the prison officials." *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011). The court considers "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). In making this determination, the court must evaluate the need for application of force, the relationship between that need and the amount of force used, the threat "reasonably perceived" by prison officials, and any efforts made to temper the severity of the forceful response. *Id.* at 7 (citing *Whitley v. Albers*, 475 U.S. 312, 321 (1986)); *accord Griffin v. Hardrick*, 604 F.3d 949, 953–54 (6th Cir. 2010); *McHenry v. Chadwick*, 896 F.2d 184, 187 (6th Cir. 1990).

The objective component requires the court to determine whether a reasonable jury could conclude that the pain inflicted by a defendant was "sufficiently serious" to offend "contemporary standards of decency." *Williams*, 631 F.3d at 383. The extent of a prisoner's injuries may weigh

in this determination; however, it is not dispositive of whether an Eighth Amendment violation has occurred. *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010). "When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated . . . [w]hether or not significant injury is evident." *Hudson*, 503 U.S. at 9.

The PLRA, however, precludes any claim by a prisoner "for mental or emotional injury suffered while in custody without a prior showing of physical injury." *Merchant v. Hawk-Sawyer*, 37 F. App'x 143, 145–46 (6th Cir. 2002) (affirming grant of summary judgment in favor of defendants where plaintiff failed to establish any physical injury as a result of sixteen-month stay in administrative detention); *Jennings v. Mitchell*, 93 F. App'x 723, 725 (6th Cir. 2004) (affirming summary judgment in the defendants' favor where plaintiff who was sprayed with a chemical agent did not establish more than a *de minimis* physical injury). Although the PRLA does not define "physical injury," courts have found that, consistent with Eighth Amendment jurisprudence, the predicate injury need not be significant but must be more than *de minimis*. *Compare Jennings*, 93 F. App'x at 725 (finding that use of pepper spray caused a *de minimis* injury) *and Jarriett v. Wilson*, 162 F. App'x 394, 401 (6th Cir. 2005) (finding that plaintiff who experienced "swelling, pain and cramps" established only a *de minimis* injury), *with Hudson*, 503 U.S. at 10 (holding blows that caused loosened teeth and a cracked dental plate are not *de minimis*), *and Flores v. Trevino*, No. 2:13-CV-298, 2014 WL 7525645, at *10 (S.D. Tex. Oct. 3, 2014) (finding that "uncontested medical evidence" established that plaintiff suffered more than a *de minimis* injury where "his hand was bleeding and swollen[, he] was given a splint and prescribed pain relievers," and he had an x-ray to rule out a fracture after defendant slammed a cell door on his hand).

### 1. The Subjective Analysis

Four factors guide the court's consideration of the subjective component of Hernandez's claim: (1) the need for the application of force; (2) the relationship between the need to use force and the amount of force used; (3) the threat reasonably perceived by the responsible officials; and (4) efforts made to temper the severity of the forceful response. *Hudson*, 503 U.S. at 7. The court finds that genuine issues of material fact exist as to two of these factors: the defendants' need to use force against Hernandez and the threat the defendants reasonably perceived Hernandez to present.

There is no dispute in the record that Hernandez first refused to comply with McKissick's orders to shower, then refused to comply with the CERT team's orders to shower, even though he understood that pepper spray would be used against him if he continued to refuse to comply. (Video; Doc. No, 150-1, PageID# 1514, ¶¶ 8, 11, 12.) When pepper spray was used, it had no effect in gaining Hernandez's compliance. (Video; Doc. No. 150-1, PageID# 1514 at ¶¶ 13, 14.) Only after pepper balls were deployed did Hernandez do what the guards had ordered. (Video; Doc. No. 150-1, PageID# 1514, ¶ 14.)

The defendants argue that it was necessary to use chemical agents against Hernandez because of his refusal to comply with direct orders and that only "necessary" and "minimal force" was applied "in a good faith effort to maintain or restore discipline." (Doc. No. 150, PageID# 1508, ¶ 17; Doc. No. 151, PageID# 2153) (citing *Whitley v. Albers*, 475 U.S 312, 320–21 (1986)). The defendants state that, once Hernandez refused an order to shower, "for multiple reasons — institutional discipline, the security of staff and inmates, and the necessity of inmate hygiene — removing [Hernandez] from his cell was the only viable option." (Doc. No. 154, PageID# 2228–29.) The defendants further argue that Hernandez's non-compliance with their orders gave them

"only two alternatives . . . either ignore him—and let every inmate in the prison understand they could refuse orders when it suited them—or remove him." (Doc. No. 154, PageID# 2227.) The defendants state that the threat to institutional discipline and control necessitated the use of chemical agents because "defiance . . . can be deadly serious in a prison setting." (Doc. No. 154, PageID# 2228.) As for the health and safety of other inmates and the prison staff, the defendants argue that "showers are—for very good reason—required and mandatory" and that requiring inmates to shower on certain days "is a very necessary policy." (Doc. No. 151, PageID# 2152.)

The basic premises of the defendants' arguments are certainly valid. There is no question "that prison security is a compelling state interest, and that deference is due to institutional officials' expertise in this area." *Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005); *see also Williams v. McLemore*, 247 F. App'x 1, 9 (6th Cir. 2007) (noting compelling interest of protecting one inmate's health and safety from threat posed by another inmate). However, questions of fact remain as to whether prison security or health and safety interests required the use of force employed against Hernandez.

First, the defendants' evidence does not resolve whether prison policy required Hernandez to shower on May 29, 2015. The post orders offered by the defendants either do not apply to the unit where Hernandez was housed or went into effect after the date of this incident. (Doc. Nos. 150-2, 150-3.) The severity of the threat posed by Hernandez's hygiene is also in question. It is undisputed that Hernandez had showered four days before the May 29, 2015 incident (Doc. No. 150-1, PageID# 1514, ¶ 9). The defendants also do not dispute Hernandez's statement that he washes himself with "Dial anti-bacterial soap and a wet washcloth from his sink . . . [and] uses Degree Antiperspirant" on days when he does not shower. (Doc. No. 152, PageID# 2169; Doc. No. 153, PageID# 2180, ¶ 5.) Hernandez also stated that he would shower on the second shift that

day, presumably only a matter of hours after the incident. (Doc. No. 1, PageID# 5, ¶¶ 14, 15; Doc. No. 150-7, PageID# 2123.)

Second, the defendant's evidence does not establish that using force to make Hernandez shower was necessary. The defendants' evidence establishes that, in the past, Hernandez had gone for long periods of time without showering, that he had refused to shower on previous occasions without being punished, and that, on one occasion in 2014, he was only given a "disciplinary for refusing a direct order" for not showering. (Doc. Nos. 118-5, PageID# 1232–57; Doc. No. 150-7, PageID# 2066). Perhaps more importantly, the shower logs offered by the defendants show that other inmates in Unit 7 went long periods of time without showering and frequently refused to shower without consequence. (Doc. No. 150-5; Doc. No. 153, PageID# 2180, 2190–92.) Indeed, other inmates did not shower or refused to shower during the first shift on May 29, 2015, but, unlike Hernandez, were not forced to do so. (Doc. No. 150-5; Doc. No. 152, PageID# 2166, ¶ 3; Doc. No. 153, PageID# 2190, 2194, 2197, 2200.)

This evidence, taken with Hernandez's statements that he would shower during the second shift and the video demonstrating that he was not physically aggressive at any point leading up to the use of chemical agents, creates a question of fact as to whether the defendants' use of force against Hernandez was excessive.[10] *See, e.g.*, *McCollum v. United States,* No. 12-CV-01175-PAB-

---

[10]     Other cases in which the Sixth Circuit considered the propriety of using chemical agents show an escalation of the incidents not present here. *See, e.g.*, *Davis v. Agosto*, 89 F. App'x 523, 524 (6th Cir. 2004) (affirming summary judgment for defendants where, before chemical agents were used to obtain plaintiff's compliance with an order to be handcuffed, plaintiff had reached his arm though his door flap and knocked a cup of tea out of a correctional officer's hand); *Miller v. Palmer*, No. 99-2352, 2000 WL 1478357, at * 1 (6th Cir. 2000) (affirming summary judgment for defendants where, before chemical agents were used, plaintiff had been "threatening and uncooperative"); *Caldwell v. Moore*, 968 F.2d 595, 596–97 (6th Cir. 1992) (affirming summary judgment for defendants where, before the officer used chemical agents, plaintiff repeatedly kicked his cell door over the course of seven hours despite being ordered to stop multiple times).

MJW, 2014 WL 788062, at *3 (D. Colo. Feb. 26, 2014) (finding disputed issue of fact as to whether a correctional officer used reasonable force when he kneed a handcuffed plaintiff in the back to obtain his compliance with an order to stop talking); *Morrison v. Jordan*, No. Civil Action No. 7:08-cv-00643, 2009 WL 4363922, at *4 (W.D. Va. Dec. 1, 2009) (concluding that a reasonable juror could find that correctional officers used excessive force when they "punched and kicked" an otherwise-passive pretrial detainee because the detainee did not follow an order to turn in his property bin and allow himself to be handcuffed).

### 2. The Objective Analysis

The court finds, however, that no genuine issue of material fact exists as to "whether a reasonable jury could conclude that 'the pain inflicted' by [the defendants] was 'sufficiently serious' to offend 'contemporary standards of decency.'" *Cordell*, 759 F.3d at 585 (quoting *Williams*, 631 F.3d at 383). Because Hernandez seeks monetary damages "for mental or emotional injury suffered while in custody," the PLRA requires that he prove he suffered more than a *de minimis* physical injury. 42 U.S.C. § 1997e(e); *Jarriett*, 162 F. App'x at 400. "A *de minimis* injury is the type of injury for which a person in the regular and ordinary events and activities of their daily lives would not seek professional medical care because home treatment would suffice." *Ward v. Aramark Corr. Food Servs.*, Civil Action No. 3:09-cv-00802, 2012 WL 1833312, at *4 (W.D. Ky. May 18, 2012) (citing *Luong v. Hatt*, 979 F. Supp. 481, 486 (N.D. Tex. 1997)); *see also Richmond v. Settles*, 450 F. App'x 448, 454 (6th Cir. 2011) (affirming grant of summary judgment to defendants where plaintiff did not demonstrate he sustained more than a *de minimis* injury when the evidence showed that plaintiff's injuries did not require any medical treatment after the initial evaluation).

Hernandez states by declaration that he was injured in two ways. First, Hernandez states that the chemical agents:

> caused [his] contact lenses to melt to his pupils and he had to physically rip his contacts off of his pupils causing [his] eyes to tear and bleed, damaging [his] vision and causing him headaches and migraines, which he still endures, and [he] endured immense pain and permanent eye damage and [his] vision has gotten worse and has changed 3 different times since he had to rip his contact lenses off of his pupils, and the chemical agents caused [his] skin to burn and the painful sensation lasted for several days, and the pain was so bad that [he] could not sleep for several days.[11]

(Doc. No. 152, PageID# 2172.) Second, Hernandez states that two of the four pepper balls fired into his cell hit his body. (Doc. No. 152, PageID# 2174.)

The defendants do not assert that Hernandez was not injured during this encounter. Rather, they argue that there is no evidence in the record to establish that Hernandez suffered more than *de minimis* injuries. (Doc. No. 151, PageID# 2152.) The defendants also argue that the video evidence belies any claim that Hernandez could make that he suffered a significant injury. (*Id.*).

Hernandez does not offer any medical records documenting his injuries or any treatment; nor is there any evidence of his injuries other than his own descriptions. The only other evidence that speaks to the pain Hernandez suffered, therefore, is the video, which unmistakably contradicts Hernandez's claims of injury. *See Scott v. Harris*, 550 U.S. 372, 378–81 (2007) (explaining that, where video evidence substantiates one party's account of the facts and contradicts the other

---

[11]  Hernandez's description of his injuries varies across articulations. In Hernandez's verified complaint, he states that "the chemical agents burned [his] skin and caused [him] extreme pain and the chemical agents burned [his] contact lenses to his eyes and when [he] tried to remove his contact lenses he had to rip them off because they were melted to [his] pupils and made his eyes bleed and caused [him] a lot of pain." (Doc. No. 1, PageID# 8.) At his deposition, Hernandez stated only that the chemical agents "melted his contact lenses to [his] eyes." (Doc. No. 150-7, PageID# 2118.)  In his grievance, he alleged none of these injuries – in fact, no injuries at all. (Doc. No. 153, Page ID# 2218-20.)

party's, a court ruling on a summary judgment motion may accept the facts as substantiated by the video as true). The video shows that, after pepper spray was sprayed into his cell, Hernandez covered his nose and mouth with a blanket. (Video at 7:48.) He appears at the window in his cell door with the blanket over his nose and mouth at least five times. (*Id.* at 7:48, 8:33, 11:06, 13:45. 16:32.) He is not touching or rubbing his eyes, and his eyes do not appear red or to be tearing. (*Id.*) He does not show any signs of distress or cry out that he is injured or in pain. (*Id.*) Instead, he seems to be trying to negotiate with the correctional officers. (*Id.* at 16:32.) After he was handcuffed and removed him from his cell, Hernandez's face can be seen clearly. (*Id.* at 18:54.) He is not blinking or squinting, and his eyes do not appear red or inflamed. (*Id.*) While Hernandez alleges that the tearing and bleeding occurred only as he removed his contact lenses, it defies logic to suggest, without any supporting medical evidence, that a chemical reaction strong enough to cause contact lenses to melt to a person's eyes would not also cause an immediate reaction. Tellingly, Hernandez stayed in his cell for at least fifteen minutes after the pepper spray was used, undermining his claim that he had been injured and confirming that Hernandez did not find the situation intolerable. (*Id.* at 1:46–18:01.)

Hernandez's second claim of injury is that he was hit by two of the four pepper balls shot into his cell. McKissick testified that the pepper balls were discharged against the walls of Hernandez's cell. (Doc. No. 150-1, PageID# 1514.) Hernandez testified that, when the pepper balls were fired, he was sitting on his bed in the cell's right-hand corner. (Doc. No. 150-7, PageID# 2126–27.) While Hernandez cannot be seen when the pepper balls are being fired, the video shows that the CERT officer firing the pepper balls aimed straight ahead and to the left. (Video at 18:00–18:32.) Hernandez does not cry out. (*Id.*) When Hernandez is removed from the cell, his upper

body and arms are clearly visible and show no marks, despite Hernandez's testimony that he experienced "bruising and swelling." (Doc. No. 150-7, PageID# 2128.)

Hernandez bears the burden of proving that his injuries were more than *de minimis*, but, as the defendants argue, he has failed to do so. At best, the video shows that Hernandez experienced discomfort from the chemical agents that resulted in a *de minimis* injury not sufficiently serious to support his claim. *Cordell*, 759 F.3d at 585. Because he has failed to offer any evidence to substantiate his claimed injuries, there are no triable issues of fact regarding the objective component of Hernandez's Eighth Amendment claim. *Chapman v. United Auto Workers Local 1005*, 670 F.3d 677, 680 (6th Cir. 2012). Although the record contains questions of fact regarding the claim's subjective component, even viewing the evidence in the light most favorable to Hernandez, a reasonable jury could not find that Hernandez suffered from sufficiently serious injuries to meet the objective element of his claim. Summary judgment for the defendants is therefore appropriate.

### D.  Due Process

In his complaint, Hernandez alleges that the defendants violated his due process rights because they did not follow TDOC policy, but he does not identify which policies were violated. (Doc. No. 1, PageID# 8.) In his opposition to the defendants' motion for summary judgment, Hernandez identifies TDOC Policy 506.08 regarding the use of force, TDOC Policy 506.07.1 regarding the use of chemical agents, TDOC Policy 502.03 regarding grooming, and DeBerry post orders regarding the use of chemical agents and the use of specialty weapons. (Doc. No. 153, PageID# 2186, 2188, 2215–17.) The court assumes that these are the policies Hernandez claims the defendants failed to follow.

"Process is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement." *Olim v. Wakinekona*, 461 U.S. 238, 250 (1983). It is well established that prison policies do not create protectable liberty interests and that a prison's failure to follow a policy does not, in and of itself, rise to the level of a constitutional violation. *See Grinter v. Knight*, 532 F.3d 567, 574 (6th Cir. 2008); s*ee also Valladolid v. Mich. Dep't of Corr.*, No. 15-1930, 2017 WL 3528221, at *3 (6th Cir. Feb. 14, 2017) ("Failing to follow proper procedures is insufficient to establish an infringement of a liberty interest."); *McVeigh v. Bartlett*, No. 94–2347, 1995 WL 236687, at *1 (6th Cir. Apr. 21, 1995) (finding that "the defendant's alleged failure to comply with a prison policy directive . . . does not rise to the level of a constitutional violation because the policy directive simply does not create a protectable liberty interest").

Accordingly, even assuming that the defendants violated certain TDOC and DeBerry policies, that fact alone is insufficient as a matter of law to establish a violation of Hernandez's right to due process. Hernandez does not allege or argue more. Summary judgment is appropriate on this claim.

### E. Fourth Amendment

In the introduction to his verified complaint, Hernandez states that the defendants violated his Fourth Amendment rights. Nowhere in the complaint or in any of his summary judgment briefing does Hernandez state the nature of his Fourth Amendment claim. Hernandez also has not offered any evidence to establish a Fourth Amendment violation.

Even if the court were to assume that Hernandez intended to claim a Fourth Amendment violation based on the defendants' search of his cell after this incident or the seizure of his (contraband) property, he could not prevail. The Fourth Amendment does not protect inmates from

searches or seizures of items in their cells. *Hudson v. Palmer*, 468 U.S. 517, 526 (1984). Instead, "[p]rison officials must be free to [search and] seize from cells any articles which, in their view, disserve legitimate institutional interests." *Id*. at 528 n.8. Hernandez has stated no basis for a viable Fourth Amendment claim, and the court cannot divine one from the record. Summary judgment for the defendants must be granted on this claim.

### F. Equal Protection

"The Equal Protection Clause prevents states from making distinctions that (1) burden a fundamental right; (2) target a suspect class; or (3) intentionally treat one individual differently from others similarly situated without any rational basis." *Johnson v. Bredesen*, 624 F.3d 742, 746 (6th Cir. 2010). Hernandez argues that the defendants targeted him because of his Hispanic ethnicity when they used force against him or, alternatively, that they intentionally and unreasonably treated him differently from all the other similarly situated inmates housed in his unit. (Doc. No. 152, PageID# 2166.) The defendants argue that there is no evidence in the record to support Hernandez's equal protection claim on any basis.

At his deposition, Hernandez testified that he believed McKissick discriminated against him when, of all the inmates in his unit, she required only him to shower. (Doc No. 150-7, PageID# 2098–99.) Hernandez testified that he was the lone Hispanic inmate in the unit and offers shower logs to show that there were white and African-American inmates who had gone longer than he had without a shower but were not targeted by McKissick. (Doc. No. 153, PageID# 2197, 2200.) Hernandez also testified that McKissick knew he was Hispanic because they had discussed it when they first met.[12] (Doc. No. 150-7, PageID# 2106.) Hernandez admits that these three facts—that

---

[12]     The defendants note that Hernandez conceded that his Tennessee Offender Management Information System (TOMIS) records identify him as white, that his mug shots state that he is white, and that his skin tone can be mistaken for white. (Doc. No. 150-7, PageID# 2036–37.)

he is Hispanic, that he was the only Hispanic inmate in his unit, and that he was the only inmate forced to shower on May 29, 2015—are the entirety of his evidence that he was discriminated against because of his ethnicity. (*Id.* at PageID# 2100.) However, Hernandez testified that, even if McKissick were not motivated by discrimination, she intentionally and unreasonably treated him differently from all other inmates on the unit. (*Id.* at PageID# 2123.)

### 1. Protected Class Claim

To establish an equal protection claim under § 1983 on the basis of race or ethnicity, a plaintiff must show that he is a member of a protected class and that he was intentionally and purposefully discriminated against because of his membership in that protected class. *Jones v. Union Cty.*, 296 F.3d 417, 426 (6th Cir. 2002); *Herron v. Harrison*, 203 F.3d 410, 417 (6th Cir. 2000). "A plaintiff presenting a race-based equal protection claim can either present direct evidence of discrimination, or can establish a prima facie case of discrimination under the burden-shifting scheme set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Umani v. Mich. Dep't of Corr.*, 432 F. App'x 453, 458 (6th Cir. 2011).

Hernandez testified that he is a member of a protected class based on his Hispanic ethnicity; that he was the only Hispanic inmate housed in Unit 7F on May 29, 2015; and that he was the only inmate forced to shower on that date. (Doc. No. 150-7, PageID# 2100.) The defendants do not dispute any of these facts. (*Id.*) Instead, they argue that there is no evidence to substantiate Hernandez's claim that he was forced to shower *because* of his ethnicity. They argue that the undisputed facts alone are insufficient to create a genuine issue of material fact that they acted with discriminatory intent.

Direct evidence of discrimination "is composed of only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor."

*Umani*, 432 F. App'x at 458 (6th Cir. 2011) (citing *Rojas v. Florida,* 285 F.3d 1339, 1342 n. 2 (11th Cir. 2002)). Hernandez offers no evidence of any such remarks or conduct of that nature by any defendant. Hernandez states that McKissick knows that he is Hispanic, but he points to no evidence from which a reasonable juror could conclude that that knowledge motivated her actions. On the other hand, McKissick has articulated a non-discriminatory reason for ordering Hernandez to shower—that he smelled bad and had poor hygiene. (Doc. No. 150-1, PageID# 1514; Doc. No. 150-5, PageID# 2134; Doc. No. 150-6, PageID# 1940–41; Doc. No. 150-7, PageID# 2066.) Even making all inferences in Hernandez's favor, there is no direct evidence of discrimination to support Hernandez's equal protection claim.

To prove his equal protection claim through indirect evidence under the *McDonnell Douglas* burden-shifting framework, Hernandez must demonstrate that "(1) he was a member of a protected class; (2) he was qualified for favorable treatment; (3) he was subjected to an adverse decision; and (4) he was treated differently than similarly situated non-protected individuals." *McKinney v. Smith*, No. 1:18-CV-603, 2018 WL 3197434, at *6 (W.D. Mich. June 29, 2018) (citing *Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008) (internal quotations omitted)). To be similarly situated, "the comparative [prisoner] 'must have dealt with the same [decision maker], have been subject to the same standards, and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or [the defendant's] treatment of them for it.'" *Umani*, 432 F. App'x at 460 (quoting *Ercegovich v. Goodyear Tire & Rubber Co*., 154 F.3d 344, 352 (6th Cir. 1998)); *see also Mitchell v. Toledo Hosp.*, 964 F.2d 577, 586 (6th Cir. 1992). Once the plaintiff sets forth a prima facie case of discrimination, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for its actions. *Arendale*, 519 F.3d at 603. If the defendant satisfies this burden, the plaintiff

must then prove by a preponderance of the evidence that the reasons offered by the defendant were a pretext for discrimination. *Id.* The ultimate burden of persuasion remains at all times with the plaintiff. *Id.*

Hernandez has failed to provide sufficient evidence from which a reasonable juror could find he has established a prima facie case under the *McDonnell Douglas* burden-shifting framework. Hernandez states that he was the only Hispanic inmate in his unit and that he was the only inmate forced to shower on May 29, 2015. Hernandez has also offered proof to show that other inmates who are not Hispanic had gone for longer periods of time than he had without showering and that other non-Hispanic inmates had refused to shower and not been punished. But Hernandez does not offer any proof to show that these inmates are similarly situated to him in three important respects. *See Nordlinger v. Hahn*, 505 U.S. 1, 10, (1992) (recognizing that "[t]he Equal Protection Clause does not forbid classifications. It simply keeps governmental decision makers from treating differently persons who are in all relevant respects alike."); *Ercegovich*, 154 F.3d at 352 (finding that a plaintiff raising an equal protection claim must show that those to whom he seeks to compare himself are "similar in 'all of the relevant aspects.'" (*quoting Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir.1994))); *Ryan v. City of Detroit*, 174 F. Supp. 3d 964, 976 (E.D. Mich. 2016) (recognizing that "the 'similarly situated' analysis must be applied with 'rigor' to maintain the Equal Protection Clause's 'focus on discrimination' and to avoid 'constitutionalizing' every encounter with a state actor") (quoting *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1207 (11th Cir. 2007)).

First, Hernandez offers no evidence to support a finding that McKissick was the decision maker with regard to any of the inmates who refused to shower whom he cites as comparators. Second, Hernandez does not offer proof that any of the comparator inmates refused repeated direct

orders to shower, as it is uncontested that Hernandez did. Finally, Hernandez does not offer any proof that he was similarly situated to the comparator inmates in terms of his personal hygiene, which is the non-discriminatory reason McKissick offers for requiring Hernandez to shower on that day. (Doc. No. 150-1, PageID# 1513, ¶ 9.) Absent any evidence to show that Hernandez was similarly situated "in 'all relevant aspects.'" to those inmates who refused to shower but were not punished, Hernandez cannot establish a prima facie claim of discrimination. *Ercegovich*, 154 F.3d at 352; *Ryan*, 174 F. Supp. 3d at 976 (recognizing that "a district court may grant summary judgment 'where it is clear that no reasonable jury could find that the similarly situated requirement has been met'") (quoting *Fares Pawn, LLC v. Ind. Dep't of Fin. Insts.*, 755 F.3d 839, 846 (7th Cir. 2014)).

Moreover, even if Hernandez could establish a prima facie case of discrimination, the defendants have offered evidence to show that McKissick had a nondiscriminatory reason for forcing Hernandez to shower—that he had poor personal hygiene. (Doc. No. 150-1, PageID# 1513, ¶ 9.) The burden thus shifts to Hernandez to show that there is a triable issue regarding whether the defendants' nondiscriminatory reason was a pretext for discrimination. *Arendale*, 519 F.3d at 603. "A reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *Shoemaker v. ConAgra Foods, Inc.*, 219 F. Supp. 3d 719, 737 (E.D. Tenn. 2016) (citing *St. Mary's Honor Center v. Hicks*, 509 U.S 502 (1993))). Again, Hernandez's failure to offer any evidence that discrimination was the reason McKissick ordered him to shower makes summary judgment appropriate. "[U]njustified assumptions do not create a genuine issue of material fact", especially where, as here, Hernandez offers no other evidence to substantiate his claim of discrimination. *Marhsall v. Decatur Cty Gen. Hosp.*, 698 F.Supp.2d 1009, 1015 (W.D. Tenn. 2010); *Young v. State Farm Mut. Auto. Ins. Co.*,

868 F. Supp. 937, 945 (W.D. Tenn. 1994) (finding that "[p]laintiff's evidence [which] essentially amounts to her personal belief . . . that she was discriminated against on the basis of age" is "insufficient to withstand a motion for summary judgment"); *see also Gunn v. Senior Servs. of N. Ky*, 632 F. App'x 839, 847 (6th Cir. 2015) (recognizing that "conclusory and unsupported allegations [of discrimination], rooted in speculation," are insufficient to create a genuine dispute of material fact for trial").

The defendants have shown an absence of evidence to establish discrimination, and Hernandez has failed to point to any evidence in the record that would create a genuine issue for trial. *See Dobrowiak v. Convenient Family Dentistry, Inc.*, 315 F. App'x 580, 583–84 (6th Cir. 2009) (noting that the moving party need not submit "'affidavits or other similar materials *negating* the [nonmovant's] claim.' It need only identify portions of the record that demonstrate the absence of a genuine issue of material fact. (citing *Celotex*, 477 U.S. at 323 and *Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002))); *Nolen*, 971 F. Supp. 2d at 711 (explaining that "[t]he moving party can prove the absence of a genuine issue of material fact by . . . attacking the nonmoving party's evidence to show why it does not support a judgment for the nonmoving party"). Summary judgment therefore is appropriate.

### 2. Class–of–One Claim

"[T]he hallmark of [a 'class-of-one' equal protection] claim is not the allegation that one individual was singled out, but rather, the allegation of arbitrary or malicious treatment not based on membership in a disfavored class." *Davis v. Prison Health Servs.*, 679 F.3d 433, 441 (6th Cir. 2012 (quoting *Aldridge v. City of Memphis*, 404 F. App'x. 29, 42 (6th Cir. 2010)). To prove a class-of-one claim, a plaintiff must establish that he was subject to "intentional and arbitrary discrimination;" that is, he must demonstrate that he "has been intentionally treated differently

from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook*, 528 U.S. at 564. He must also establish that he was similarly situated in all relevant respects to those whom he cites as comparators. *See Ercegovich*, 154 F.3d at 352.

"The 'rational basis' test means that courts will not overturn government action 'unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [the court] can only conclude that the [government's] actions were irrational.'" *Warren v. City of Athens,* 411 F.3d 697, 710–11 (6th Cir. 2005) (quoting *Kimel v. Fla. Bd. of Regents,* 528 U.S. 62 (2000)). A plaintiff can establish that "a government action lacks a rational basis in one of two ways: either by 'negativ[ing] every conceivable basis which might support' the government action or by demonstrating that the challenged government action was motivated by animus or ill-will." *Id.* at 711 (quoting *Klimik v. Kent Cty. Sheriff's Dep't.*, 91 F. App'x 396, 400 (6th Cir. 2004) (citations omitted)); *see also Bower v. Vill. of Mount Sterling*, 44 F. App'x. 670, 677–78 (6th Cir. 2002) (recognizing that "a § 1983 plaintiff's challenge to the lack of a rational basis for an equal protection claim cannot succeed if there is any reasonably conceivable state of facts that could provide a rational basis for the classification" (internal citation omitted)). To establish animus or ill will, "a plaintiff must prove that the challenged government actions were motivated by personal malice unrelated to the defendant's official duties." *Klimik*, 91 F. App'x at 401 (citing *Hilton v. City of Wheeling*, 209 F.3d 1005, 1008 (7th Cir. 2000)).

Although the record shows that other inmates may have gone longer without showering than Hernandez and that Hernandez himself may have refused to shower in the past without being disciplined, McKissick had "at least one conceivable basis" to order Hernandez to shower on May 29, 2015. *Warren*, 411 F.3d at 711. There is no dispute in the record that Hernandez had not showered for four days before McKissick ordered him to do so or that McKissick believed

Hernandez's personal hygiene was unacceptable on the date in question. There is also no question that maintaining the health and safety of inmates is a legitimate government interest. The question then becomes whether Hernandez can show that McKissick acted out of "personal malice" against him. Hernandez's only evidence to show McKissick's ill will is his statement that he felt she was "picking on him." That is not enough to create a triable issue of fact in light of McKissick's statements of her reasons for requiring Hernandez to shower. *Chappell v. GTE Products Corp.*, 803 F.2d 261, 268 (6th Cir. 1986) (noting that "[m]ere personal beliefs, conjecture and speculation are insufficient to support an inference of . . . discrimination")). Summary judgment is appropriate on this claim.

### G.  Qualified Immunity

Because the court concludes that summary judgment is appropriate on the merits of Hernandez's claims, it need not address whether qualified immunity would have shielded the defendants from liability.

### V.  Conclusion

For these reasons, the defendants' motion for summary judgment (Doc. No. 149) is GRANTED, and this action is DISMISSED.

It is so **ORDERED**.

ENTER this 21st day of September 2018.

Aleta A. Trauger
United States District Judge